**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

**LARRY JAMES**                                                          **PLAINTIFFS**

**VS.**                                                      **CIVIL ACTION NO.: 3:03CV525LN**

**CINCINNATI INCORPORATED, et al.**                                      **DEFENDANTS**


**DEFENDANT CINCINNATI INCORPORATED'S MEMORANDUM BRIEF IN
SUPPORT OF MOTION IN LIMINE TO PRECLUDE TESTIMONY OF L.D. RYAN**


The testimony of Plaintiff's proffered expert witness, L.D. Ryan, should be precluded from trial because it is neither relevant nor reliable under Federal Rule of Evidence 702.

**A.    FACTS**

In 1988, Cincinnati manufactured the subject press brake according to the specifications of the purchaser, Hunter Engineering, and shipped it without dies. [1]  A press brake is a universal, multi-purpose metal-fabricating machine tool.  (Ryan depo., pp. 118-119).  It can punch, notch, cut, and bend metal into an infinite variety of shapes and angles.  *(Id.*, pp. 47-50, 119, 121-122).  Employers such as Hunter Engineering use press brakes for millions of different bending operations.  *Id.*, p. 123.  During a single day, these employers typically change the dies in their press brakes and often make different parts.  *Id.*, pp. 123-124.  Like all press brakes manufactured since the early part of this century, the subject press brake was provided with foot controls to allow the operator to support the ends of the piece parts extending through the dies during the slow bending operation.[2]  Hazards

---

[1]  Deposition of L. D. Ryan, p. 113.  A copy of the cited portions of Mr. Ryan's deposition is attached as Exhibit 2. Three photographs of the press brake are attached in Exhibit 1and were identified as Exhibits 1, 2 and 9 in Plaintiff's deposition, pp. 44-45, 51, 66.

[2]  Deposition of Plaintiff, pp. 63-64; deposition of L.D. Ryan, pp. 102.  A copy of the cited portions of Plaintiff's deposition is attached as Exhibit 3.  Two photographs of the footswitch are attached in Exhibit 1 and were identified as Exhibits 5 and 10 in Plaintiff's deposition, pp. 55, 78.

exist in press brake operations because bending metal requires force and a point of operation, and it is impossible to eliminate these hazards. *Id.*, pp. 140-141. Since no universal guard exists to safeguard all press brake bending operations, the employer must evaluate its bending operation and select one of the ten or so safeguarding methods. Thus, in press brake bending operations, there is some unavoidable level of acceptable risk. *Id.*, p. 145.

On February 1, 2001, Plaintiff was operating the press brake with a footswitch and bending a piece part designed by Hunter. (*Id.*, pp. 112-113, 282-284; Plaintiff's depo., p. 50) Hunter had set up the press brake to use its "stroke stop" feature, which stopped the ram a short distance above the work piece for final positioning and then required a second activation of the foot switch to complete the bend. (Plaintiff's depo. pp. 51, 57-58, 63-64.) Plaintiff and a co-worker , Kevin McPherson, were forming "U" shaped steel wrappers for a wheel balancing machine. *Id.*, p. 25. On their fifth piece, after the side flanges of the piece part were formed, Plaintiff and McPherson formed a 90 degree bend so the piece part was shaped like an "L." *Id.*, pp. 67-68. They moved the piece part into the press brake to form the other bend of the "U." *Id.* As they were aligning the piece part, Plaintiff had improperly placed his right hand inside the die area, and the press cycled. *Id.*, pp. 69-70. The ram descended and stopped above the work piece at its stroke stop position, but it nevertheless injured Plaintiff's right hand. *Id.*, pp. 70-72. McPherson used the emergency stop button to raise the press brake and to release Plaintiff's hand. *Id.* After the accident, Hunter chose to install light curtains on the press brake and engaged Cincinnati to install a PSD Interface on the press brake the so that it could accept a light curtain.[3]

### 1.    Mr. Ryan's lack of expertise

---

[3]  Deposition of Allen Parish, plant manager of Hunter Engineering, pp. 24-25. A copy of the cited portions of Parish's deposition is attached as Exhibit 4.

To support his claims that the subject press brake was defectively designed, Plaintiff has engaged L.D. Ryan as an expert witness. Mr. Ryan is not an expert in press brakes. He has a four-page CV, but the words "press brake" nowhere appear on it. (Ryan depo., pp. 260-261). He doesn't remember ever consulting in any other press brake case. *Id.*, p. 273. He has never published anything on press brakes, and he has never published anything on machine safeguarding. *Id.,* p. 264. He is neither a member of the American Society of Safety Engineers, nor the National Society of Professional Engineers, nor the National Safety Council. *Id.,* p. 275. Mr. Ryan never inspected the subject press brake. *Id.*, p. 11. Moreover, despite conceding the necessity of dies to form a point of operation and the absence of them in the sale of the subject press brake, Mr. Ryan nevertheless believes that the subject press brake was sold with a point of operation. *Id.*, pp. 113-114. Contrary to Plaintiff's testimony that the press brake spontaneously lowered on his hand, Ryan testified that Plaintiff activated the press brake inadvertently and that the press brake operated properly. *Id.*, pp. 10, 79-80.

Mr. Ryan testified that for press brake bending operations, there are at least ten effective safeguarding devices, including palm buttons.[4] *Id.*, pp. 30. Indeed, Ryan specifically testified that press brakes were sold today with some protection such as palm buttons "might be fine." *Id.*, pp. 156. In fact, the subject press brake was equipped with palm buttons.[5]

### 2.    Mr. Ryan's untested light curtain theory

Though he admitted that the press brake was not defectively manufactured, Ryan testified that the subject press brake was defectively designed because it lacked a light curtain, also known

---

[4] These other safeguards include two-hand controls, barrier guards, safety mats, two-pressure rams, moving gates, automated lines, presence sensing devices, palm buttons, and slide dies. *Id.*, pp. 23. Mr. Ryan did not consider other safeguards such as hand tools, hand restraints or guarding by location to be acceptable. *Id..*, pp. 31, 33, 34.

[5]  Plaintiff's deposition, pp. 34-35. A photograph of the palm buttons is attached in Exhibit 1 and was identified as Exhibit 3 in Plaintiff's deposition, p. 52.

as a presence-sensing device or PSD.[6]  *Id.*, pp. 52, 79, 86.  He has never designed a light curtain.  *Id.*, p. 92.  He believed that his light curtain would have a linear set of lights, but he would choose one from a catalog.  *Id.*, pp. 87-88.  "That's the first thing you do is you search them out and look at them."  *Id.*, p. 88.  However, Mr. Ryan admitted that he hasn't taken even this first step.  "I haven't done that analysis."  *Id.*

A number of different light curtains are available, but Mr. Ryan doesn't know which ones would be appropriate.  *Id.*, p. 90.  Likewise, he doesn't know which light curtains would be unacceptable.  *Id.*, p. 88.  He doesn't know how many light emitting diodes or receivers his light curtain should have.  *Id.*, p. 89.  He doesn't know if the number of lights in his light curtain would matter.  *Id.*, p. 89.  He doesn't know the width of his light curtain.  *Id.*, p. 91.  Because he hasn't studied it, he doesn't even know if a six-inch light curtain would be appropriate.  *Id.*, pp. 90-91.  He does not know the sensitivity level that his PSD would need.  *Id.*, p. 95.  He does not know the model he would choose or the specifications of any PSD's.  *Id.*  He does not know if his PSD would need a floating blank capability – indeed, he does not know what a floating blank is.  *Id.*, p. 101.  To answer these questions, he would need to check the catalogs, which he estimated would form a stack about six inches high.  *Id.*, pp. 90-91.  However, he did not check them in this case.  *Id.*, pp. 91-92, 94.  In essence, Mr. Ryan did not even take his very first step in proposing an alternative design for the press brake -- he didn't read the catalogs.

   **3.    Mr. Ryan's ignorance of the bending operation**

Mr. Ryan also knew nothing about of the bending operation involving the subject press brake.  He did not know the dimensions of the piece part.  *Id.*, pp. 96, 98.  He did not know who

---

[6]  Mr. Ryan alternatively theorized that he could design a universal barrier guard for press brakes, but he admitted that he has neither designed such a guard nor tested it.  *Id.*, pp. 36-39.  He has not tested any barrier guards because "You do not do a lot of testing like lawyers think you do.  You just design them." *Id.*, pp. 167-168.

designed the piece part. *Id.*, p. 126. He never saw a picture of the piece part. *Id.*, p. 97. He never saw a drawing of the piece part and was not sure of the number of bending operations required for it. *Id.*, p. 97. Ryan did admit that Cincinnati did not design the piece part or the dies or choose the press operators. *Id.*, p. 134. Likewise, he admitted that Cincinnati did not train the set-up person or the operator and did not set up the gauges for the bending operation. *Id.*, p. 138. He did not know whether Hunter had equipped the press brake with pull-back wrist restraints at the time of the accident or had provided hand tools. *Id.*, p. 65. He did not know if Hunter Engineering set up the bending operation properly. *Id.*, p. 227.

Mr. Ryan did not know what the part looked like after the first bend. *Id.*, p. 98. He did not know the angle of the bend. *Id.*, p. 99. He did not know how close his PSD would need to be to the point of operation. *Id.*, pp. 95-96. He did not know the length of the die and made a "wild, wild, wild guess" that it might be four feet long. *Id.*, p. 112. In short, Mr. Ryan admitted, "I don't know anything about this bending operation." *Id.*, p. 100.

### 4.    **The deficiencies of Mr. Ryan's light curtain theory**

Though Mr. Ryan knew that the piece part would protrude from the front of the machine during the bending operation, he did not know how far the edge of the piece part would be from the point of operation during the bending operation. *Id.*, pp. 102-103. Ryan admitted that the light curtain would "probably" need some adjustments for a bending operation, but he didn't know what adjustments would be necessary because again, he did not have a "stack of catalogs here which would lead me through it." *Id.*, p. 127.

Ryan conceded that the piece part would protrude through the beams of his light curtain and that "two or three lights have got to be cut before this thing works." *Id.*, p. 105. However, Ryan did not know the width of the gap left by the two or three deactivated lights. *Id.*, pp. 105-106. Ryan

conceded that if this gap were three inches, it would not be safe because the operator could get his hand into the point of operation. *Id.*, p. 106. Nevertheless, Ryan did not do the research to determine if his light curtain could have protected this bending operation because they "just haven't gone to the catalogs." *Id.*, pp. 106-107.

### 5.    The unreliability of Mr. Ryan's light curtain theory

Ryan admitted that light curtains cannot be used on every part. *Id.*, pp. 130-131. Indeed, Ryan admitted that a piece part with a flange would block more than one light and "then this thing is going to conk." *Id.*, p. 132. Mr. Ryan testified that the Plaintiff's deposition testimony was not important to him. *Id.*, p. 249. However, if he had read the Plaintiff's deposition and examined its exhibits, which included photographs of the piece part, he would have discovered that the subject piece part actually had a flange.[7] Thus, according to Ryan himself, his light curtain would have "conked" and failed to prevent this accident. Indeed, the plant manager of Hunter Engineering, Allan Parish, testified that light curtains are not foolproof because lights must be blanked out where the material is going to be. "In other words you have to blank out a row of lights that will be hitting the part itself . . . so you can conceivably get your hand in with the part and the machine still functions even with the light curtains. (Parish depo., pp. 41.)

Ryan testified that in such cases, the machine is without protection, but "that's where warnings come in," and manufacturers "cannot be responsible for people who go around" warnings. (Ryan depo., pp. 131). Ryan admitted that the Plaintiff did something wrong and failed to obey Cincinnati's warning to keep hands out of the die area, especially since it wasn't necessary for Plaintiff to put hands in the die area during Hunter's bending operation.[8] Likewise, Ryan admitted

---

[7]  Plaintiff's deposition, pp. 63, 88. Three photographs of the subject piece part are attached in Exhibit 1 and were identified as Exhibits 6, 7, and 8 in Plaintiff's deposition, p. 60.

[8]  Ryan depo., pp. 84, 251; Plaintiff's depo. pp. 51-52. Three photographs of the warnings are attached in Exhibit 1and were identified as Exhibits 11, 13, and 14 in Plaintiff's deposition, pp. 81-84.

that Hunter did not obey Cincinnati's warnings on the subject press brake to provide point of operation safeguards. *Id.*, p. 82.

**B.**     **LAW**

    **1.**     **Mr. Ryan's theory fails the reliability tests under Rule 702 and *Daubert***

Federal Rule of Evidence 702 provides that a witness "qualified as an expert . . may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." At trial, Plaintiff proposes to present Mr. Ryan's sixteen opinions, which basically boil down to his untested belief that the press brake should have been manufactured with a light curtain. Mr. Ryan is not a press brake expert, and he stands alone in his opinion. When asked to identify any other authority supporting his opinion, he admitted, "Nobody's going to say that except me here in deposition." *Id.*, pp. 185.

The Fifth Circuit does not permit Plaintiff to pitch such untested, unsupported theories to a jury. "[T]he court must ensure the expert uses reliable methods to reach his opinions, and those opinions must be relevant to the facts of the case. *Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 2004), citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 2798-99 (1993). "The Supreme Court listed several non-exclusive factors to guide courts in their screening function: whether the proposed evidence or theory "can be (and has been) tested"; whether it "has been subjected to peer review and publication"; whether it has been evaluated in the light of "potential rate[s] of error"; and whether the theory has been accepted in the "relevant scientific community." *Guy,* 394 F.3d at 325, *citing Daubert,* 509 U.S. at 597, 113 S. Ct. at 2798-99.

In this case, Mr. Ryan's testimony satisfies none of *Daubert's* four considerations.  First, he admitted that his first step would be to consult catalogs to determine which light curtain to use, **but he never did so**.  (Ryan depo., pp. 88, 91-92, 94, 106-107, 127).  Ryan flatly admitted that he did no testing to support his theory that press brakes should be equipped with his light curtain.  *Id.*, pp. 164-165.  Though Ryan admitted that cost was an important factor in setting up bending operations, he did not test his light curtain against any of the other available safeguarding methods to determine which one is the most safe or cost-effective.  *Id.*, pp. 137, 165.  He did no cost analysis or marketing research to determine if employers would decline to purchase press brakes if his light curtains were required on them.  *Id.*, pp. 175-177.  He did no testing to determine if his light curtain would limit the utility or usefulness of a press brake.  *Id.*, p. 177.  In essence, Mr. Ryan believes, "Testing is dumb, dumb, dumb when I can go to a catalog and pick up an O.E.M. product . . ." *Id.*, p. 168.

Second,  Mr. Ryan's concept has not been subjected to peer review.  He has not presented any seminars on his theory that press brakes should be manufactured with his light curtain.  *Id.*, pp. 182-183.  He has not published his theory anywhere.  *Id.*, p. 182.  He has never published anything on press brakes at all.  *Id.*, p. 264.  Indeed, he has never published anything regarding any machine safeguarding whatsoever.  *Id.*  He could not even point to a single publication articulating his theory that all press brake manufacturers must equip press brakes with light curtains.  *Id.*, pp. 183-185.

Third, Mr. Ryan cannot know the rate of error for mandatory light curtains on press brakes since he did no testing.  Thus, even though he admits that light curtains require adjustment, Mr. Ryan did no testing and does not know their rate of error.  *Id.*, p. 169.  Likewise, he did no testing to determine if his light curtain would create any additional hazards.  *Id.*, pp. 166-167.  However, he did concede that if the light curtain is misadjusted, the employer bears the responsibility, not the manufacturer.  *Id.*, pp. 169-170.

Fourth and last, the community generally does not accept Mr. Ryan's opinion. While Ryan stated that he did not personally know whether the press brake manufacturing community has generally accepted the notion that all press brakes must be manufactured with light curtains, he conceded as far as he knew, he stood alone with his opinion. *Id.*, pp. 223, 185. Ryan could not identify a single press brake manufacturer that has ever required light curtains with their press brakes. *Id.*, p. 221. He believed they were wrong unless they did so, even though he hadn't researched it. *Id.*, p. 221. Thus, he believes that all press brakes manufactured from at least 1982 to the present are defective because they were not equipped with light curtains. *Id.*, pp. 208-209. Thus, under the standards set forth in Daubert, Mr. Ryan's testimony must be precluded from trial because it is unqualified, untested, and unreliable.

2.    **Applicable law requires precluding Mr. Ryan's untested, unreliable theory.**

The Fifth Circuit recently affirmed excluding an expert's untested theory in *Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). In that case, plaintiff brought a design defect claim under the Mississippi Products Liability Act ("MPLA") against Crown, a stand-up forklift manufacturer. While operating the forklift in a "forks following" manner, plaintiff collided with warehouse railings and lost her balance. Her left leg came out of the operator compartment and was crushed between the forklift and railings. *Id.*, at 323. Crown moved to exclude the testimony of plaintiff's expert who opined that the forklift was defective because it did not have an operator compartment closure or a body restraint. *Id.*, at 326. The expert did not state which design he preferred, did not estimate the cost of any design, and did not state whether the designs would satisfy the standard for a MPLA feasible design alternative -- whether they would impair the usefulness, utility, desirability or practicality of the forklift. *Id.* Alternatively, the expert suggested an operator-compartment door which was already manufactured by Crown, concluding that the door must be

safe and economically feasible because Crown was already manufacturing them.  *Id.*  The expert then summarily stated that the door would not impair the utility, usefulness, desirability or practicality of the forklift.  *Id.*

The district court found that the expert's opinions were untested and unreliable and failed the *Daubert* analysis.  The court "also disapproved of [the expert's] failure to test any of his designs" and noted that the expert had not reached any concrete conclusions about the *best* design alternative.  Instead, he had merely presented conceptual suggestions instead of specifically formulated opinions.  Thus, the district court ruled that "these deficiencies, coupled with the lack of testing, rendered [the witness's] expert opinion unreliable."  *Id.*, at 327.  On appeal, the Fifth Circuit affirmed and noted that the expert never presented a specific design or a complete "end product."  *Id.*  As a result, his "conceptual suggestions about a restraining device as a feasible design alternative did not rise to the level of an admissible expert opinion."  *Id.*  Moreover, even though the expert relied on Crown's own design and tests of the forklift compartment door, the court found the tests did not concern left-leg injuries and that the expert only concluded cursorily "that the door would not impair the forklift's utility, usefulness, practicality or desirability."  *Id.*  Thus, the court affirmed the district court ruling to exclude the expert's testimony.  *Id.*

Like the untested expert's opinion in *Guy*, Mr. Ryan's theory in this case should be excluded.  Ryan did no testing of his theory that contradicts decades of press brake design and industry standards.  He disparages the concept of testing and did not even test his light curtain to determine if it would have prevented this very accident.  To the contrary, Ryan's own testimony establishes that his light curtain would have failed to safeguard the subject bending operation because the flanges of the piece part would have blocked the light curtain.  Like the expert in *Guy*, Ryan cannot claim that *Daubert* factors are irrelevant simply because Hunter installed a light curtain on the press

brake after the accident.  And like the expert's theory in *Guy*, Ryan's theory suffers from failing to reach any concrete conclusions about the best design alternative because Ryan repeatedly referred to additional accepted means of safeguarding, particularly his undesigned, untested barrier guard. In sum, Ryan never submitted a complete "end product."  In the context of press brake product liability cases, federal courts have concluded likewise.  In *Shaffer v. Amada America*, 335 F. Supp.2d 992 (E.D. Mo. 2003), the plaintiff injured his right hand when a press brake cycled, and his expert presented six opinions, including his opinion that a safety guard such as a light curtain would have prevented this accident.  The court found that the expert's opinion failed the Rule 702 and *Daubert* tests.  First, his testimony was unreliable because is was not based on sufficient facts or data and he had little experience with press brakes.  Second, he had never conducted any tests on press brakes, had never designed, tested, or sketched the devices he claims would have prevented the accident, and did not know whether any of his proposals would work or would interfere with the normal operation of the press brake.  *Id.*, at 995.  Third, there was no peer review of his theories and no published articles on press brakes, and since there was no testing of alternative designs, there was no known rate of error.  *Id.*  Finally, there was "no evidence of the general acceptance of the [expert's] abstract theory that his laundry list of devices would have prevented the accident."  *Id.*

Another federal court addressed a remarkably similar case in *Young v. Cincinnati Incorporated,* No. PB-C-97-355, slip op. CE.D. Ark. Mar. 19, 1999), *aff'd, 198 F.3d 252 (Table) (8th Cir. 1999)* (copies attached as Exhibit 5).  In this case, the plaintiff was injured on a press brake and his expert opined (1) the press brake was defective because it contained a foot pedal, and (2) if the press brake was equipped with a foot pedal, it should also have been equipped with one of five guarding mechanisms.  *Id.*, at 2.  The court noted that since the guarding mechanisms are available, this concept could be tested, but it was not.  *Id.*  Likewise, the expert did not subject his opinion to

peer review or publication, and in the absence of testing, the rate of error could not be determined. Finally, the court held that whether the concept is generally accepted cannot be determined when the concept has not been tested. *Id.*, at 3. As a result, the expert's opinion failed the *Daubert* test, and the court excluded his testimony. *Id*

Courts have repeatedly excluded witnesses whose testimony, like Mr. Ryan's, is untested and unreliable. In *Watkins v. Telesmith, Inc.,* 121 F.3d 984 (5th Cir. 1997), the court upheld the exclusion of an engineer based upon the fact that the witness had not conducted testing of his proposed alternative design. In *Hammond v. Coleman*, 61 F.Supp.2d 533 (S.D. Miss. 1999), aff'd 209 F.3d 718 (5th Cir. 2000), the court excluded the plaintiff's proposed expert where the expert "conducted no tests" and "had never designed nor manufactured nor had experience in the designing or manufacturing of lanterns . . ." *See also, Lavespere v. Niagara Machine,* 910 F.2d 167 (5th Cir. 1990) (plaintiff's expert did not provide sufficient evidence to meet plaintiff's burden in product liability case involving a press brake); *Farris v. Coleman*, 121 F.Supp.2d 1014 (N.D. Miss. 2000). Lastly, the Fifth Circuit in *Watkins* approvingly cited two applicable cases from the Eighth Circuit: *Dancy v. Hyster Co.,* 127 F.3d 649 (8th Cir. 1997), *cert. denied,* 523 U.S. 1004 (1998)(testimony of an engineer's expert testimony precluded where the expert had not tested his theory or designed the device he suggested) and *Peitzmeier v. Hennessy Industries, Inc.*, 97 F.3d 293 (8th Cir. 1996), *cert. denied*, 520 U.S. 1196 (1997)(*Daubert* precluded the admission of the plaintiff's liability witness because the engineer had neither designed nor tested his proposed alternative design).

C.     **CONCLUSION**

Mr. Ryan is neither an expert in press brakes nor light curtains. His theory that press brakes should be equipped with light curtains is totally unfounded, untested, and unreliable. His opinion fails the tests set forth in Rule 702 and *Daubert*, and controlling law precludes the admission of Mr.

Ryan's testimony at trial.  The case law resolutely establish that Mr. Ryan's testimony is unreliable

and therefore inadmissible.    This Court should grant the motion of Defendant Cincinnati

Incorporated and order that Mr. Ryan's testimony is precluded from trial of this matter.

Respectfully submitted,

CINCINNATI INCORPORATED

BY:   S/ Roland M. Slover
ROLAND M. SLOVER, MSB # 6846
STEVEN H. RAY, *Pro Hac Vice Admission 5/23/05*

OF COUNSEL:

Roland M. Slover, Esq.**,** MSB #6846
**FORMAN PERRY WATKINS KRUTZ & TARDY LLP**
200 South Lamar Street
City Centre Building, Suite 100 (39201-4099)
P.O. Box 22608
Jackson, Mississippi  39225-2608
Telephone:  (601) 960-8600

Steven H. Ray, Esq. *(pro hac vice admission 5/23/05)*
**DINSMORE & SHOHL, LLP**
255 East 5th Street, Suite 1900
Cincinnati, OH 54202
Telephone: (513) 977-8408

## CERTIFICATE OF SERVICE

I, Roland M. Slover, the undersigned attorney, do hereby certify that I have this day electronically filed the forgoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

John Hunter Stevens
GRENFELL, SLEDGE & STEVENS
1855 Lakeland Drive, Suite N-10
Post Office Box 16570
Jackson, Mississippi 39236-6570
**ATTORNEY FOR PLAINTIFF**

Clifford B. Ammons, Esq.
WATKINS & EAGER
400 E. Capitol Street, Ste. 300
Jackson, MS 39205-0650
**ATTORNEY FOR LUMBERMAN'S MUTUAL**

This, the 7th day of October, 2005.

S/ Roland M. Slover
**ROLAND M. SLOVER**