**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

**LARRY JAMES**                         **PLAINTIFFS**

**VS.**                     **CIVIL ACTION NO.: 3:03CV525LN**

**CINCINNATI INCORPORATED, et al.**             **DEFENDANTS**

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF**
**ITS MOTION IN LIMINE TO PRECLUDE**
**PLAINTIFF'S EXPERT FROM TESTIFYING**

Plaintiff has missed several key points of Defendant's motion in limine to preclude the testimony of L.D. Ryan. First, while Ryan may be a engineer and an expert in printer slotters and singing robot cowboys,[1] he is not an expert in designing press brakes or light curtains. Second, Ryan's testimony is vague and is not based upon sufficient facts or data. Third, Ryan's theory is junk science and is not the product of reliable principles and methods. Fourth, Ryan has failed to apply scientific principles and methods reliably to the facts of the case. Thus, under the mandates of Rule 702 of the Federal Rules of Evidence, Ryan's testimony should be precluded.

**A.**     <u>**Mr. Ryan is Not an Expert in Press Brakes or Light Curtains.**</u>

Ryan may be a mechanical engineer, but his lengthy CV nowhere mentions press brakes or light curtains, and his nine pages of prior testimony do not list a single prior case involving press brakes or light curtains. This is the first press brake case for Ryan, who has never designed a press brake or a light curtain. *Id.*, pp. 92, 273. While Plaintiff contends that Ryan designed a

---

[1] Deposition of L.D. Ryan, pp. 36, 67, 172, 269. A copy of the cited portions of Ryan's deposition testimony is attached as Exhibit 2 to Cincinnati's Motion in Limine.

Maxi-press, this machine was *not* a press brake, as Ryan himself admitted.  "[I]t's not like a long ten-foot or eight-foot press brake.  The force area is smaller."  *Id.*, at 110. While Ryan was unsure about whether the clutches of press brakes differ from those of punch presses, he did know that punch presses have smaller work areas.  *Id.,* at 109.

Though Plaintiff extols Ryan's expertise in a case involving a printer slotter machine, other courts have rejected his theories involving different machines.  (Exhibit 5 to Plaintiff's Opposition, p. 29)  In *Christ v. Sears, Roebuck & Company,* 149 F.3d 1182, 1998 WL 344049 (6th Cir. 1998) (unpublished decision attached as Exhibit 1), the Sixth Circuit rejected Ryan's attempt to testify as a product liability expert on radial arm saws.  Noting that "Ryan said he had not done a model or any sort of prototype of his proposed design modifications," the court stated, "Ryan's testimony must meet the baseline requirements of reliability and relevance."  *Id*., pp. 2-3.  The court thus held, "The district court did not abuse its discretion in determining that Ryan's testimony was not admissible.  Ryan's testimony was properly excluded under Rule 702."  *Id*., p. 4.

Two months ago, a Mississippi federal court similarly rejected Ryan's expert testimony in a ladder case because it was not based on sufficient facts. "Ryan testified that the bend in the left rear rail was suggestive of racking; however, tests of exemplar ladders resulted in no similar failures.  In short, there is no evidence from which a jury could reasonably conclude that the ladder was racked at the time of the accident or that racking was the cause of Ms. Johnson's fall." *Johnson v. Davidson Ladders, Inc.*, 2005 WL 1871170 (N.D.Miss. Aug. 4, 2005) (copy attached as Exhibit 2).  The district court also found that Ryan's testimony was deficient "with regard to a feasible alternative design" as was required under Miss. Code Ann. §11-1-63(f)(ii).  Thus, the court held, "Ryan's conclusory assertion notwithstanding, plaintiffs failed to adduce any

2

evidence to demonstrate the extent of the risk that the alternative design would have avoided or how the alternative design would have affected its utility." *Id.* Despite evidence of numerous other accidents, there was "no evidence relative to the effectiveness of the alternative design in reducing the severity or frequency of accidents." *Id.*

Likewise, in *Kirby v. Langston's Furniture & Appliance, Inc.*, 631 So.2d 1301, 1305 (La. App. 1994), a case involving a riding lawnmower, the court precluded Ryan's opinion and noted, "We share the concern expressed by the trial court in his reasons for judgment that there is an absence of fact or scientific data utilized by Ryan in forming his opinion as to the ultimate causation of this accident." Even though Ryan *actually tested* the riding lawnmower in that case, the court still rejected his opinion. "His opinion must be rejected because it is based on his own conjecture and speculation and ignores empirical data and the testimony of witnesses." *Id.*

Ryan is no expert in press brakes or light curtains. He has never published anything on press brakes, light curtains, or any type of machine safeguarding. (Ryan depo., p. 264) He may be an engineer, but he lacks the expertise to testify about designing press brakes or light curtains.

**B.      Mr. Ryan's theory is vague.**

Like the expert's theory in *Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 2004), Ryan's theory in this case is vague. Plaintiff tries to distinguish *Guy* by asserting, "Dr. Ryan clearly has stated that the specific feasible design alternative in this case was the light curtain." (Plaintiff's Response Brief, p. 6) However, Ryan's actual deposition testimony is not so clear. He first testified that many methods of safeguarding bending operations are acceptable, "providing Cincinnati supplies them." (Ryan depo., p. 46) These methods include two-hand controls, barrier guards, safety mats, two-pressure rams, moving gates, automated lines, presence-sensing devices, palm buttons, and slide dies. *Id.*, pp. 24-30. He then testified that

press brakes "ought to be provided with an operator presence, light curtain, or some kind of innovative barrier guard that gets out of the way when you don't need it," though he admitted he had not designed or tested any barrier guards.  *Id.*, pp. 36-39, 74-75, 167-168.   Ryan later explained that press brakes should be equipped with a light curtain "or the equivalent," which he described as a "removable barrier guard, a removable gate," or two-hand controls with appropriate fixtures to hold the work piece.  *Id.*, pp. 159-160.  Finally, he added safety mats and two-pressure rams, noting, "[A]nd that's really the ones I'm going to stick with."  *Id.*, p. 160.  When asked if any of these would be sufficient options instead of a light curtain, he responded, "It depends."  *Id.,* p. 160.   Ryan also testified that if press brakes were sold today with some protection such as palm buttons, they  "might be fine."  *Id.*, p. 156.   The subject press brake was actually equipped with palm buttons.  (Plaintiff's deposition, pp. 34-35)

C.    **Mr. Ryan's theory is not based upon sufficient facts or data.**

Ryan's ignorance of the facts in this case is astounding.  This is just a partial list of the things Ryan did not do and did not know before rendering his opinion:

- He did not inspect the subject press brake.   (Ryan depo., p. 11)
- Did not have Plaintiff's deposition and was not sure he had read it.  *Id.*, at 249
- Did not believe Plaintiff's deposition testimony was important.  *Id.*, p. 249.
- Knew nothing about the bending operation using the press brake.  *Id.*, p. 100.
- Did not inspect the piece part and did not know its dimensions.  *Id.*, pp. 96, 98.
- Did not know who designed the piece part.  *Id.*, p. 126.
- Never saw a picture or a drawing of the piece part.  *Id.*, p. 97.
- Did not know the number of bending operations in making the part.  *Id.*, p. 97.
- Did not know if Hunter had equipped the press brake with pull-back wrist restraints or hand tools at the time of the accident.  *Id.*, p. 65.
- Did not know if Hunter had set up the bending operation properly.  *Id.*, p. 227.
- Did not know what the part looked like after the first bend.  *Id.*, p. 98.

4

• Did not know the angle of the bend.  *Id.*, p. 99.

• Did not know how far the edge of the piece part was from the point of operation during the bending operation.  *Id.*, pp. 102-103.

• Did not know the length of the die.  *Id.*, p. 112.

Essentially, the only information Plaintiff argues that Ryan used to support his theory was his telephone call to Plaintiff and co-employee deposition transcripts.[2]  Ryan candidly admitted that he did zero testing to support his testimony:

• He did not test his theory that press brakes should be manufactured with light curtains.  *Id.*, pp. 164-165.

• Did not test any light curtain against any other available safeguarding methods to determine which one is the most safe or cost-effective.  *Id.*, pp. 137, 165.

• Did no cost analysis or marketing research to determine if employers would decline to purchase press brakes if light curtains were required.  *Id.*, pp. 175-177.

• Did no testing to determine the rate of error for light curtains knowing that  light curtains do require adjustment.  *Id.*, p. 169.

• Did no testing to determine if his light curtain would create any additional hazards.  *Id.*, pp. 166-167.

• Did no testing to determine if his light curtain would limit the utility or usefulness of a press brake.  *Id.*, p. 177.

Though the Fifth Circuit found lack of testing was key in precluding the expert in *Guy, supra,* Ryan tried to brush off testing and claimed, "Testing is dumb, dumb, dumb. . . "  *Id.*, p. 168.

**D.** 	**Mr. Ryan's theory is junk science -- not the product of reliable principles and methods.**

No authority supports the preposterous theory that press brakes are defective unless they are manufactured with light curtains.  Instead of supporting Ryan's position, both OSHA and

---

[2]  Though Plaintiff stated that Ryan "was provided the specific model of press brake at issue," (Response Brief, p. 3) he was actually provided with the model *number*.  Ryan never examined or built any models in this case.

ANSI standards contradict his wild theory and acknowledge that a press brake is a multi-purpose metal-fabricating tool that does not have a universal safeguard.  The standards require the employer first to determine how the machine will be used in a forming system that also incorporates dies, piece parts, and one or more operator/helper.  Once the employer knows these elements of the forming system, then he can select among a dozen or so accepted methods of safeguarding, including light curtains.  Thus, federal OSHA regulations thus require employers to provide safeguards for press brake bending operations under 29 C.F.R. § 1910.212 (a)(1):

> One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation . . .  Examples of guarding methods are -- barrier guards, two-hand tripping devices, electronic safety devices, etc.

Likewise, 29 C.F.R. § 1910.212 (a)(3)(ii) also requires employers to guard bending operations:

> The point of operation of machines whose operation exposes an employee to injury, shall be guarded.  The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

OSHA standards also incorporate ANSI standards by reference, and ANSI B11.3-1982 addresses the use of power press brakes under Section 6:

> 6.1 Employer Responsibility
>
> 6.1.1  Safety Standard Compliance.  It shall be the responsibility of the employer, whether or not the employer is the owner, to insure that the power press brake is in compliance with 1.3 prior to its use, and to provide safe tooling, safe guarding, and safe operating conditions for his employees.
>
> 6.1.2  Training Responsibility.  It shall be the responsibility of the employer to exercise care in the selection of employees, to train employees in the care, set-up and use of power press brakes in individual piece-part vending operations.
>
> Periodic retraining is required for all operating personnel.  Training should include but not be limited to the following specific instructions:

(1)     The hazards of placing any body member within the point of operation to prevent serious bodily injury.

(2)  The function and purpose of:

(a)     operating controls . . .

(3)     The hazards and dangers which are related to each specific piece-part bending operation.  A piece-part bending system is an orderly arrangement of components that act to perform a specific task to a given piece-part.  They are as follows:

(a)     The specific piece-part,

(b)     The tooling designed or determined to perform the required piece-part bend or function,

(c)     The power press brake to be utilized along with its operating control stations,

(d)     The power press brake operator's function for loading, operating, and unloading the piece-part, and

(e)     Finally, the safeguarding means itself, which is the last but most important component necessary within the piece-part bending system.

(4)     The dangers of unsafe work practices, inattention, horseplay and misuse of equipment.

(5)     The function and purpose of safeguarding provisions for every job or piece-part operation. . . .

6.1.3   Enforcement Responsibility.  It shall be the responsibility of the employer to establish, monitor and enforce appropriate rules for safe operation of power press brake operating procedures; for example,

(1)     To recognize if an operator hazard exists on any particular piece-part operation or tooling and to take appropriate corrective action.

(2)     To enforce strictly the use of safeguarding provisions provided for a particular piece-part operation. . . .

6.1.4  Safeguarding the Point of Operation.  It shall be the responsibility of the employer, after selecting the tools and specific type of power press brake for producing a piece-part,

to evaluate that operation before the piece-part is worked (bent, etc.) and to provide point-of-operation safeguarding according to the provisions of 6.1.4(1). . . .

In contrast to these widely accepted standards of the metal-forming industry, Ryan's theory is not the product of reliable scientific methods.  He has never subjected his theory to peer review, never presented any seminars on his theory, and never published his theory.  (Ryan depo., pp. 182-183)  He cannot identify a single publication articulating his theory.  *Id.*, pp. 183-185.  When asked to identify any other authority supporting his opinion, Ryan conceded as far as he knew, he stood alone in his opinion, "Nobody's going to say that except me here in deposition."  *Id.*, pp. 223, 185.  No other press brake manufacturer has ever required purchasing light curtains with their press brakes.  *Id.*, p. 221.  Indeed, Ryan believes that all press brakes manufactured from at least 1982 to the present are defective because they were not equipped with light curtains.  *Id.*, pp. 208-209.

Plaintiff wrongly claims that Ryan used the same methods employed in industry and recommended by Cincinnati.  Ryan has confused the issues of designing a safe press brake and designing a safe bending operation using a press brake, and even if he had opined on Hunter's design of the bending operation, his opinion still has an insufficient factual basis, unreliable methodology, and incorrect conclusions.  Cincinnati does not reject its duty to manufacture a safe product; indeed, the subject press brake complies with ANSI B11.3 standards regarding the manufacture of press brakes.[3]  However, because no universal safeguard exists for press brakes, OSHA and ANSI both charge employers with the duty to safeguard bending operations.  No one can select an appropriate guard until they know all the elements of a bending operation -- piece parts, the dies, the number of operators, their skill level, and the type the press brake.  In this

---

[3]  Affidavit of Charles Prewitt, pp. 5, 6.  A copy of Mr. Prewitt's Affidavit was previously filed with the Court.

case, Ryan admitted that Cincinnati did not design the subject piece part or dies, did not set up gauges or part supports, and did not select or train the set-up person or the operators. (Ryan depo., pp. 134, 138) Accordingly, both OSHA and ANSI obligated Hunter Engineering to provide adequate safeguarding for the subject bending operation.

**E.** **Mr. Ryan did not apply scientific methods reliably to the facts of this case.**

In addition to ignoring reliable engineering principles and methods, Ryan has failed to apply his own unscientific method reliably to this case. He testified that the first thing to do to determine if a light curtain would safeguard the subject bending operation would be to choose one from a catalog. *Id.*, pp. 87-88. "That's the first thing you do is you search them out and look at them." *Id.*, p. 88. However, Ryan admitted that he hasn't taken this first step. "I haven't done that analysis." *Id.* His failure to take the first step in his own skewed, unreliable methodology is just the tip of the iceberg. Ryan's testimony establishes that his opinion is complete guesswork and that he knows nothing about his light curtain theory or how it applies to this case:

- Though a number of different light curtains are available, Ryan does not know which ones would be appropriate in this case. *Id.*, p. 90.
- He does not know which light curtains would be unacceptable. *Id.*, p. 88.
- Does not know how many light-emitting diodes his light curtain should have. *Id.*, p. 89.
- Does not know how many receivers his light curtain should have. *Id.*
- Does not know if the number of lights in his light curtain would matter. *Id.*, p. 89.
- Does not know the width of his light curtain. *Id.*, p. 91.
- Does not know if a six-inch light curtain would be appropriate. *Id.*, pp. 90-91.
- Does not know the sensitivity level that his PSD would need. *Id.*, p. 95.
- Does not know the model he would choose or specifications of any PSD. *Id.*
- Does not know if his PSD would need a floating blank capability. *Id.*, p. 101.
- Does not know what a floating blank is. *Id.*, p. 101.

9

• Does not know how close his PSD should be to the point of operation. *Id.*, pp. 95-96.

• Does not know what adjustments would be necessary to the light curtain, though it would probably need adjustment. *Id.*, p. 127.

• Though he admitted that the piece part would protrude through the beams of his light curtain and that "two or three lights have got to be cut before this thing works," he does not know the width of the gap left by the two or three deactivated lights. *Id.*, pp. 105-106.

• Admitted that if this gap were three inches, it would not be safe because the operator could get his hand into the point of operation. *Id.*, p. 106.

• Did no research to determine if his light curtain could have protected this bending operation. *Id.*, pp. 106-107.

• Admitted that light curtains cannot be used on every part. *Id.*, pp. 130-131.

Perhaps most significantly, Ryan admitted that a piece part with a flange would block more than one light and "then this thing is going to conk." *Id.*, p. 132. Since the subject piece part actually did have a flange, a light curtain could not have prevented this accident. (Plaintiff's deposition, pp. 63, 88)

In contrast, Cincinnati had already equipped the subject press with safeguarding device that would have prevented this accident – a hand-foot control device. (Prewitt Affidavit, p. 6) This device requires an operator to place both hands on the palm buttons to lower the ram to the stroke stop position 1/4" above the work piece. The device then switches control to the footswitch so that the operator can support the part as the ram completes its cycle and bends the part. Since Plaintiff injured his hand when he inadvertently activated the footswitch and lowered the ram to the stroke stop position, the accident could not have occurred if Hunter Engineering had chosen to use Cincinnati's hand-foot control device. By turning two dials on the press brake control box, Hunter Engineering could have engaged the device, required Plaintiff to place his hands on the palm buttons, and prevented him from putting his hands inside the die area. *Id.*

10

**F.      Conclusion.**

Though Plaintiff's Response Brief does not contain a single citation to Ryan's deposition transcript, his testimony abundantly demonstrates that his theory fails the prerequisites of Federal Rule of Evidence 702.  Ryan is not "qualified as an expert."  His testimony is not based upon sufficient facts or data.  His theory is not the product of reliable principles and methods. He has not applied valid principles reliably to the facts of this case.  Though Ryan tries to dismiss these glaring deficiencies by claiming that "*Daubert* issues ... are ridiculous sometimes," his testimony must nevertheless conform to the reliability standards set forth in *Daubert* and Rule 702.  *Id.*, at 109.

Plaintiff cites only two cases for support, oddly including *Guy v. Crown Equipment Corp.*, 394 F.3d 320 (5ᵗʰ Cir. 2004), because it supports excluding Ryan's testimony where the court affirmed precluding an expert from presenting his similarly vague and untested theory that stand-up forklifts are defective unless they are equipped a compartment door which had been an optional piece of equipment. Plaintiff also ignored two decisions addressing identical theories that press brakes should be equipped with light curtains and in which the courts concluded that these untested, unreliable theories were not admissible.  *Shaffer v. Amada America*, 335 F. Supp.2d 992, 995 (E.D. Mo. 2003); *Young v. Cincinnati Incorporated,* No. PB-C-97-355, slip op. CE.D. Ark. Mar. 19, 1999), *aff'd, 198 F.3d 252 (Table) (8ᵗʰ Cir. 1999)*(copy attached as Exhibit 5 to Cincinnati's Brief in Support of Motion).[4]  Using the same rationale as these cases

---

[4]*See, also, Watkins v. Telesmith, Inc.,* 121 F.3d 984 (5ᵗʰ Cir. 1997) (exclusion upheld based on lack of testing proposed alternative design); *Hammond v. Coleman*, 61 F.Supp.2d 533 (S.D. Miss. 1999), aff'd  209 F.3d 718 (5ᵗʰ Cir. 2000) (exclusion affirmed because plaintiff's expert conducted no tests and had never designed nor manufactured lanterns); *Lavespere v. Niagara Machine,* 910 F.2d 167 (5ᵗʰ Cir. 1990) (exclusion affirmed of plaintiff's expert who did not provide sufficient evidence in a press brake case); *Farris v. Coleman*, 121 F.Supp.2d 1014 (N.D. Miss. 2000); *Dancy v. Hyster Co.,* 127 F.3d 649 (8ᵗʰ Cir. 1997), *cert. denied,* 523 U.S. 1004 (1998) (upholding exclusion of the testimony of an untested theory of an engineer expert); *Peitzmeier v. Hennessy Industries, Inc.*, 97 F.3d 293 (8ᵗʰ Cir. 1996), *cert. denied*, 520 U.S. 1196 (1997) (affirming preclusion of plaintiff's witness because the engineer had neither designed nor tested his proposed alternative design).

11

and *Guy*, Mr. Ryan's untested, unfounded, and unreliable theory should be precluded from trial.

The motion in limine of Defendant Cincinnati Incorporated should be granted.

Respectfully submitted,

CINCINNATI INCORPORATED

BY:    S/ Roland M. Slover
ROLAND M. SLOVER, MSB # 6846
STEVEN H. RAY, *Pro Hac Vice Admission 5/23/05*

OF COUNSEL:

Roland M. Slover, Esq., MSB #6846
**FORMAN PERRY WATKINS KRUTZ & TARDY LLP**
200 South Lamar Street
City Centre Building, Suite 100 (39201-4099)
P.O. Box 22608
Jackson, Mississippi  39225-2608
Telephone:  (601) 960-8600

Steven H. Ray, Esq. *(pro hac vice admission 5/23/05)*
**DINSMORE & SHOHL, LLP**
255 East 5th Street, Suite 1900
Cincinnati, OH 54202
Telephone: (513) 977-8408

## <u>CERTIFICATE OF SERVICE</u>

I, Roland M. Slover, the undersigned attorney, do hereby certify that I have this day electronically filed the forgoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

John Hunter Stevens
**GRENFELL, SLEDGE & STEVENS**
1855 Lakeland Drive, Suite N-10
Post Office Box 16570
Jackson, Mississippi 39236-6570
*ATTORNEY FOR PLAINTIFF*

Clifford B. Ammons, Esq.
**WATKINS & EAGER**
400 E. Capitol Street, Ste. 300
Jackson, MS 39205-0650
*ATTORNEY FOR LUMBERMAN'S MUTUAL*

This, the <u>20th</u> day of October, 2005.

S/ Roland M. Slover
ROLAND M. SLOVER