**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

**LARRY JAMES**                                                              **PLAINTIFFS**

**VS.**                                                 **CIVIL ACTION NO.: 3:03CV525LN**

**CINCINNATI INCORPORATED, et al.**                                **DEFENDANTS**


**CINCINNATI INCORPORATED'S MEMORANDUM BRIEF IN**
**SUPPORT OF ITS MOTION  FOR JUDGMENT NOTWITHSTANDING**
**THE VERDICT OR ALTERNATIVELY, FOR A NEW TRIAL OR**
**ALTERNATIVELY, FOR REDUCTION OF VERDICT**


Pursuant to Rule 50 and 59 of the Federal Rules of Civil Procedure, defendant Cincinnati

Incorporated ("Cincinnati") renews its motion for a judgment as a matter of law; Cincinnati also

moves in the alternative for a new trial or for a remittitur of the damages awarded by the jury in this

case.  The Court should grant this relief both for the reasons stated at trial and for the reasons set

forth more specifically in the motion and this memorandum.  Cincinnati incorporates by reference

all of the arguments previously raised before the Court.

**I.  INTRODUCTION**

This case involved a product liability claim for personal injuries arising out of an accident

in which Plaintiff Larry James, while employed by Hunter Engineering,  sustained an injury to his

right hand while operating a press brake manufactured by Cincinnati.  This case was tried before the

Court on November 1 through November 3, 2005.  After approximately one and a half hours of

deliberations, the jury returned a 7-0 verdict on Thursday, November 3, 2005, in favor of Plaintiff

Larry James.    The only theory of liability submitted to the jury  was defective design pursuant to

Miss. Code Ann. §11-1-63.  The jury awarded total compensatory damages of $850,000.00 in actual

damages and accessed 60% fault to Cincinnati Incorporated, 30% fault to Plaintiff's employer

Hunter Engineering and 10% fault to the Plaintiff.

## II.  THE APPLICABLE LEGAL STANDARDS

The standard for ruling on motions for directed verdicts and for judgment notwithstanding

the verdict was set out in Boeing Co., v. Shipman, 411 F.2d 365 (5th Cir. 1969) wherein the Court

stated:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence – not just that evidence which supports the non-mover's case – but in the light and with all reasonable inferences most favorable to the party opposed to the  motion.  **If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. .. .** The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict.  **There must be a conflict in substantial evidence to create a jury question.**

Id. at 374-375 (emphasis added).

A different standard is employed in ruing on a motion for new trial.  In United States ex rel.

Weyerhauser Co. v. Bucon Construction Co., 430 F.2d 420, 423 (5th Cir. 1970) the Court stated the

following standard for granting a motion for new trial;

> In passing on a motion for a new trial, the court may and should exercise a sound discretion, and its ruling thereon will not be reviewed in an appellate court in the absence of a clear abuse of discretion.  **A trial judge, on a motion for a new trial, may set aside a verdict and grant a new trial, if in his opinion 'the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of the verdict.'**

## III.  ARGUMENT

At trial the Plaintiff submitted a claim for defective design pursuant to the Mississippi

Product Liability Act ("MPLA"), Miss. Code Ann. §11-1-63 et. seq.  In order to prove his claim

based on defective design under the MPLA, Plaintiff was required to prove each of the following

elements by a preponderance of the evidence:

> (a)   [A]t the time the product left the control of the manufacturer or seller: . . .
>
> (i)3.   The product was designed in a defective manner, ...
>
> (ii)   The defective condition rendered the product unreasonably dangerous to the user or consumer; and
>
> (iii)   The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.
>
> (f)(i)   The manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought; and
>
> (iii)   The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm.  A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.

§ 11-1-63

At trial, the Plaintiff did not meet his burden of proof as to the following essential elements

of his claim: (1) that the press brake was defectively designed and (2) that there existed a feasible

alternative design that would have prevented Plaintiff's injury without impairing the utility and

usefulness of the press brake.  In addition, the evidence at trial overwhelmingly supported the

statutory defenses afforded Cincinnati under the MPLA.  Accordingly, the Court should enter

judgment notwithstanding the verdict, or a new trial on liability and compensatory damages.

**A.    Plaintiff's Evidence Of Defective Design Was Insufficient For Reasonable Jurors To Conclude That The Press Brake Was Defectively Designed.**

**1.  Evidence of defect.**

Based on the evidence presented at trial, no reasonable juror could conclude that the

Cincinnati press brake was defectively designed and a judgment notwithstanding the verdict should be entered for Cincinnati. Alternatively, the jury's verdict was against the overwhelming weight of the evidence and a new trial should be granted.

At trial the Plaintiff's sole proof of a design defect was the testimony of Plaintiff's expert witness L.D. Ryan. Mr. Ryan testified that in his opinion the press brake was defectively designed because it should have been sold with a light curtain, also known as a presence sensing device or PSD. While Cincinnati addresses its contention that Mr. Ryan's opinion was improperly admitted elsewhere in this memorandum, it is important to note here that Mr. Ryan had no experience in designing press brakes or light curtains; had never been accepted as an expert in any press brake case; failed to inspect the press brake at issue and failed to even test his theory.

In marked contrast to the unsupported and untested opinion of Mr. Ryan, the evidence at trial was overwhelming and undisputed that the press brake at issue was manufactured in compliance with all applicable OSHA and ANSI regulations. Because of the multi-use capability of press brakes, OSHA and ANSI indisputably required the employer - not the manufacturer - to safeguard the point of operation. In addition evidence was presented that no press brake manufacturer in the United States provides point of operation safeguarding on press brakes as a matter of course.

The evidence was also undisputed that the press brake at issue was not defectively designed and unreasonably dangerous because it was sold to Hunter Engineering with a mode of operation known as "hand-foot sequencing" which would have prevented Plaintiff's accident. This mode of operation would have required Plaintiff to use dual palm buttons (which were purchased by Hunter with the press brake in 1988) to lower the ram to the stroke stop position (approximately 1/4 inch above the work piece) - thus keeping Plaintiff's hands occupied and out of the die area. The machine control would then change over to the foot switch for the actual bending operation so that

Plaintiff could use his hands to support the metal piece part during the bend.

The testimony of the Hunter Engineering employees at trial was undisputed that material supports held the flat piece part while the ram was lowered to the stroke-stop position. As a result, Plaintiff did not need to support the metal with his hands and therefore could have used the dual palm buttons to lower the ram to stroke stop. The evidence was undisputed that if Hunter merely turned two switches on the press brake and activated the hand-foot sequencing mode, Plaintiff's accident would not have happened.

Based on the foregoing, no reasonable juror could have concluded that the press brake was defectively designed because it was not sold with a light curtain.

### 2. Evidence of feasible alternative design.

The MPLA defines a feasible alternative design as a "design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." Miss. Code Ann. § 11-1-63 ((f)(ii). Plaintiff failed to present evidence from which a reasonable jury could have concluded that an alternative feasible design existed as required by the MPLA.

Again, Mr. Ryan provided Plaintiff's only testimony regarding a feasible design alternative. Mr. Ryan, however never inspected the subject press brake and never performed any tests to determine whether his light curtain would have been a feasible alternative. Mr. Ryan merely speculated that the light curtain would have worked and would have prevented the accident based on the fact that Hunter put light curtains on the press brake several months after the accident.

There was no testimony or other evidence presented by the Plaintiff however that the light curtain was in fact a feasible alternative because Mr. Ryan never tested his light curtain theory. He never once attempted to make the part Plaintiff was making at the time of his accident on the subject

press brake using a light curtain.  Moreover there was no evidence that Hunter even continued to manufacture the part Plaintiff was making at the time of the accident using a light curtain on the subject press brake.  Instead, the Hunter employees testified that the subject press brake was moved from Raymond to its facility in Durant, Mississippi, and that Hunter no longer made the part Plaintiff was making at the time of the accident.

The testimony of Cincinnati's expert witness, Charles Prewitt, also made clear that to make the part Plaintiff was forming at the time of the accident would have required the presence of a six inch "hole" in the light curtain in order to take into account the flanges on the piece part and the thickness of the material supports.  The light curtain would not detect anything (including Plaintiff's hand), were it placed inside the six inch hole.   At trial Mr. Ryan agreed  that anything over three inches would be "unsafe."  Accordingly, no reasonable juror could have concluded that Plaintiff's design alternative would have prevented the Plaintiff's accident as required by the MPLA.

In addition, Plaintiff presented absolutely no evidence as required by the MPLA  that including light curtains on Cincinnati's press brakes would not have impaired the utility, usefulness, practicality, or desirability of the product.  Mr. Ryan testified that indeed, the light curtain would limit the usefulness of a press brake, and he guessed at the percentage of parts that could no longer be made on a press brake with a light curtain.  Indeed, Mr. Ryan did no testing, cost analysis, or marketing research whatsoever to determine whether including light curtains on press brakes would impair the utility, practicality or desirability of press brakes. Consequently Plaintiff presented no evidence on this required element of his claim.  In contrast, Cincinnati presented the testimony of Ralph Wellington, who amply demonstrated that mandatory light curtains would impair the usefulness, cost, desirability, and functionality of press brakes because many press brake operations cannot be performed using a light curtain to guard the point of operation.  The same point was

reinforced through the ANSI regulations which recognize that there is no universal method of safeguarding press brakes and therefore employers who design their bending operations and not manufacturers must be responsible for safeguarding.

In sum,  Plaintiff failed to present any credible evidence  that the installation of a light curtain would have been a feasible alternative and  would  have prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users as required by the MPLA.

**B.      The Evidence At Trial Overwhelmingly Supported Cincinnati's MPLA Defenses.**

The MPLA  provides a number of defenses to manufacturers of products;

> (b)      A **product is not defective in design** or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an **inherent characteristic** of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

> (d)      In any action alleging that a product is defective pursuant to paragraph (a) of this section, the manufacturer or seller **shall not be liable** if the claimant (i) had **knowledge of a condition** of the product that was inconsistent with his safety; (ii) appreciated the danger in the condition; and (iii) deliberately and voluntarily chose to expose himself to the danger in such a manner to register assent on the continuance of the dangerous condition.

> (e)      In any action alleging that a product is defective pursuant to paragraph (a)(i)(2) of this section, the manufacturer or seller **shall not be liable** if the danger posed by the product is known or is **open and obvious** to the user or consumer of the product, or should have been known or open and obvious to the user or consumer of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons who ordinarily use or consume the product.

Miss. Code Ann. § 11-1-63(b), (d), (e) (emphasis added).

At trial Cincinnati produced overwhelming evidence supporting its defenses under the MPLA.  These defenses incorporate principles of  inherent characteristics of products, assumption

of the risk and open and obvious dangers.  See § 11-1-63(b),(d) and (e).

At trial Cincinnati  demonstrated overwhelmingly that an inherent characteristic of the product is that it exerts force and bends metal as part of a bending operation designed by the employer - not Cincinnati.  This inherent characteristic - the need to exert force to bend metal - cannot be eliminated without compromising the usefulness and desirability of the product and is recognized by anyone that works with press brakes.  The evidence was undisputed that the Plaintiff recognized this characteristic, appreciated the danger of placing his hands between the dies, and had read the warning signs on the press brake warning against putting hands in the die area prior to the accident.  In addition Cincinnati demonstrated through the uncontradicted testimony of Ralph Wellington that Plaintiff's alleged feasible design alternative would impair the usefulness and desirability of the product because the numerous and varied types of bending operations for which press brakes have traditionally been used could not be performed using a light curtain to safeguard the point of operation.

**C.     Plaintiff's Expert L.D. Ryan Should Not Have Been Allowed To Testify.**

Federal Rule of Evidence 702 provides that a witness "qualified as an expert . . may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

At trial, Plaintiff offered as his sole evidence of a design defect, the testimony of L.D. Ryan, whose opinion basically boiled down to his untested belief that the press brake should have been manufactured with a light curtain.  As was made clear at trial, Mr. Ryan is not a press brake expert, and he stands alone in his opinion.

The Court should have granted Cincinnati's motion in limine to exclude the untested and

unsupported opinion of L.D. Ryan pursuant to the Fifth Circuit's decision in Guy v. Crown Equipment Corp., 394 F.3d 320, 325 (5th Cir. 2004).   In Guy, the Court directed that district courts "must ensure the expert uses reliable methods to reach his opinions, and those opinions must be relevant to the facts of the case." Id., citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 2798-99 (1993). "The Supreme Court listed several non-exclusive factors to guide courts in their screening function:  whether the proposed evidence or theory "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether it has been evaluated in the light of "potential rate[s] of error," and whether the theory has been accepted in the "relevant scientific community. " Guy, 394 F.3d at 325, citing Daubert, 509 U.S. at 597, 113 S. Ct. at 2798-99.

In this case, Mr. Ryan's testimony satisfied none of *Daubert's* four considerations.  Mr. Ryan flatly admitted that he did no testing to support his theory that press brakes should be equipped with light curtains.  He did not test his light curtain against any of the other available safeguarding methods to determine which one is the most safe or cost-effective.  He did no cost analysis or marketing research to determine if employers would decline to purchase press brakes if his light curtains were required on them.   He did no testing to determine if his light curtain would limit the utility or usefulness of a press brake. .

Second,  Mr. Ryan's theory was never subjected to peer review.  He has not presented any seminars on his theory that press brakes should be manufactured with light curtain.  He has never published anything on press brakes, and he never published anything regarding any machine safeguarding whatsoever.

Third, Mr. Ryan did not know the rate of error for mandatory light curtains on press brakes since he did no testing.  Thus, even though he admitted that light curtains require adjustment, Mr.

Ryan did no testing and does not know their rate of error.  Likewise, he did no testing to determine if his light curtain would create any additional hazards.

Fourth and last, the community generally does not accept Mr. Ryan's opinion.  The community of press brake manufacturers, employers, and labor unions reflected in the ANSI B11.3 committee which formulated the applicable press brake standards flatly disagree with Mr. Ryan's opinion as the ANSI standards recognize that there is no universal method of safeguarding press brakes and, because of that fact, the duty to guard the point of operation is placed on the employer (who designs the bending operation) and not the manufacturer.  Mr. Ryan conceded that he stood alone in his opinion that press brakes should be sold with light curtains.   Mr. Ryan could not identify a single press brake manufacturer that has ever required light curtains with their press brakes.   Thus, under the standards set forth in Daubert, Mr. Ryan's testimony should have been precluded from trial because  it was unqualified, untested, and unreliable.

The Fifth Circuit  affirmed excluding an expert's untested theory virtually identical to Mr. Ryan's in Guy, supra, 94 F.3d 320 (5th Cir. 2004).  In that case, plaintiff brought a design defect claim under the Mississippi Products Liability Act ("MPLA") against Crown, a stand-up forklift manufacturer.  While operating the forklift in a "forks following" manner, plaintiff collided with warehouse railings and lost her balance.  Her left leg came out of the operator compartment and was crushed between the forklift and railings.  Id., at 323.  Crown moved to exclude the testimony of plaintiff's expert who opined that the forklift was defective because it did not have an operator compartment closure or a body restraint.  Id., at 326.  The expert did not state which design he preferred, did not estimate the cost of any design, and did not state whether the designs would satisfy the standard for a MPLA feasible design alternative -- whether they would impair the usefulness, utility, desirability or practicality of the forklift.  Id.  Alternatively, the expert suggested an operator-

compartment door which was already manufactured by Crown, concluding that the door must be safe and economically feasible because Crown was already manufacturing them.  Id.  The expert then summarily stated that the door would not impair the utility, usefulness, desirability or practicality of the forklift.  Id.

The district court found that the expert's opinions were untested and unreliable and failed the Daubert analysis.  The court "also disapproved of [the expert's] failure to test any of his designs" and noted that the expert had not reached any concrete conclusions about the *best* design alternative. Instead, he had merely presented conceptual suggestions instead of specifically formulated opinions. Thus, the district court ruled that "these deficiencies, coupled with the lack of testing, rendered [the witness's] expert opinion unreliable."  Id., at 327.  On appeal, the Fifth Circuit affirmed and noted that the expert never presented a specific design or a complete "end product."  Id.  As a result, his "conceptual suggestions about a restraining device as a feasible design alternative did not rise to the level of an admissible expert opinion."  Id.  Moreover, even though the expert relied on Crown's own design and tests of the forklift compartment door, the court found the tests did not concern left-leg injuries and that the expert only concluded cursorily "that the door would not impair the forklift's utility, usefulness, practicality or desirability."  Id.  Thus, the court affirmed the district court ruling to exclude the expert's testimony.  Id.

Like the untested expert's opinion in Guy, Mr. Ryan's opinion in this case should have been excluded.  Ryan did no testing of his theory that contradicts decades of press brake design and industry standards.  He disparaged the concept of testing and did not even test his light curtain to determine if it would have prevented the Plaintiff's accident.  To the contrary, Ryan's own testimony established that his light curtain would have failed to safeguard the subject bending operation because there would have been at least a six inch hole in the curtain due to the  flanges of the piece

part and the material supports.

Like the expert in Guy, Ryan's untested opinion should have been excluded. Courts have repeatedly excluded witnesses whose testimony, like Mr. Ryan's, is untested and unreliable. In Watkins v. Telesmith, Inc., 121 F.3d 984 (5th Cir. 1997), the court upheld the exclusion of an engineer based upon the fact that the witness had not conducted testing of his proposed alternative design. In Hammond v. Coleman, 61 F.Supp.2d 533 (S.D. Miss. 1999), aff'd 209 F.3d 718 (5th Cir. 2000), the court excluded the plaintiff's proposed expert where the expert "conducted no tests" and "had never designed nor manufactured nor had experience in the designing or manufacturing of lanterns . . ." See also, Lavespere v. Niagara Machine, 910 F.2d 167 (5th Cir. 1990) (plaintiff's expert did not provide sufficient evidence to meet plaintiff's burden in product liability case involving a press brake); Farris v. Coleman, 121 F.Supp.2d 1014 (N.D. Miss. 2000). Lastly, the Fifth Circuit in Watkins approvingly cited two applicable cases from the Eighth Circuit: Dancy v. Hyster Co., 127 F.3d 649 (8th Cir. 1997), cert. denied, 523 U.S. 1004 (1998)(testimony of an engineer's expert testimony precluded where the expert had not tested his theory or designed the device he suggested) and Peitzmeier v. Hennessy Industries, Inc., 97 F.3d 293 (8th Cir. 1996), cert. denied, 520 U.S. 1196 (1997)(Daubert precluded the admission of the plaintiff's liability witness because the engineer had neither designed nor tested his proposed alternative design).

Because Mr. Ryan was improperly allowed to offer his untested and unsupported opinion to the jury in this case, and because Mr. Ryan was the sole source of any evidence for the Plaintiff of a design defect, judgment NOV should be entered for Cincinnati or alternatively a new trial granted.

**D.      The Court Erred in Failing to Instruct The Jury On Misuse and Intervening /Superseding Cause Based On The Fault of Plaintiff's Employer Hunter Engineering.**

Cincinnati specifically noted in the jury instruction conference and on the record its objection

to the Court's failure to instruct the jury that the negligence of Plaintiff's employer Hunter Engineering in failing to comply with its duty under OSHA to safeguard the press brake's point of operation might be considered a superseding cause of Plaintiff's injury thereby relieving Cincinnati of any liability. The jury should have been allowed to consider whether Hunter's failure to safeguard the point of operation -- in violation of applicable OSHA regulations and in complete disregard of the volumes of information provided to Hunter by Cincinnati concerning Hunter's duty to safeguard and methods of safeguarding -- was a superseding cause of Plaintiff's injury.

The issue of the "foreseeability" of Hunter's conduct and therefore whether Hunter's negligence was a superseding cause should have been a question for the jury. In Minert v. Harsco Corp., 614 P. 2d 686 (Wash. App. 1980), a case in which plaintiff fell from an unstable ladder, the court affirmed the trial court's instruction to the jury on superseding cause based on the employer's failure to comply with OSHA regulations. The Court stated:

> Plaintiff argues that the employer's duty of care to plaintiff is not a proper issue in a strict tort liability setting. Therefore plaintiff concludes it was improper to admit testimony regarding the employer's duty under the WISHA/OSHA standards. We disagree. Evidence showing the failure of plaintiff's employer to use due care was admissible. **It tended to establish an intervening, superseding cause of plaintiff's injury.**

Id. at 690 (emphasis added).

In McCormick v. Bucyrus-Erie Co., 400 N.E.2d 1009 (Ill. App., 1980), a case involving an employer's addition of counterweights to a crane in violation of OSHA standards, the court similarly allowed OSHA standards to be used for the purpose of establishing a superseding cause of plaintiff's injuries. In McCormick, the court stated:

> Another asserted error is the court's allowance into evidence of the fact that OSHA rules prohibit the use of extra counterweight above that which comes from the manufacturer. Plaintiffs argue that such evidence ought not to have been allowed in, since neither plaintiff

> was shown to be aware of the rule. We disagree. The admission into evidence of the substance of the OSHA regulation was relevant to the question of misuse on the part of [employer] the contractor. We have previously noted that misuse by a third party, which *causes* the accident, acts to bar recovery against the defendant.

Id. at 1018 (emphasis in original). Similarly in Mississippi, misuse as a bar to recovery for products liability is a question of fact for the jury. Pickering v. Industria Masina I Traktora (Imt), 740 So. 2d 836, 845 (Miss. 1999) (citing Materials Transportation Co., v. Newman, 656 So. 2d 1199, 1202 (Miss. 1995); Early-Gary, Inc. v. Walters, 294 So. 2d 181, 186 (Miss. 1974)).

In this case Hunter's failure to comply with OSHA regulations and failure to comply with Cincinnati's explicit instructions regarding Hunter's duty to safeguard the point of operation could have been considered a misuse of the product and an intervening/superseding cause of plaintiff's injury. Similarly, in State Stove Manufacturing Co. v. Hodges, 189 So. 2d 113, 123 (Miss. 1966) the court determined that the plumbing contractor's failure to install the temperature relief valve prescribed and required by the water heater manufacturer, and which would have prevented the explosion, was an intervening, sole proximate cause of the damages. See also, E.I. DuPont de Nemours & Company v. Ladner, 73 So. 2d 249 (Miss. 1954) (where manufacturer of chemical compound gave express notice to the processor not to use it for cattle feed and processor ignored the warning - its failure to heed it was the intervening, sole proximate cause of the purchaser's damages.)

Accordingly, the jury should have been provided with an instruction regarding Hunter Engineering's negligence in failing to comply with OSHA standards and failure to comply with Cincinnati's instructions regarding safeguarding the press brake's point of operation as a superseding cause of plaintiff's injury. The Court should therefore vacate the judgment and the jury verdict and order a new trial.

**E.**      **The Amount Of The Verdict Was Against The Great Weight Of The Evidence And A New Trial Should Be Granted Or The Verdict Reduced.**

At trial the Plaintiff produced evidence of medical expenses in the amount of $46,286.77. No evidence was presented as to any future medical expenses. The Plaintiff's lost wage evidence reflected lost wages for 63 weeks from the date of injury on February 1, 2001, in the amount of $25,521.71. The amount of medical expenses and lost wage evidence totaled $71, 808.48. The Plaintiff also introduced evidence of a 20% permanent disability to his right hand.

The jury's verdict of $850,000.00 is almost twelve times the amount of Plaintiff's medicals and lost wages. As such the jury's verdict is against the overwhelming weight of the evidence and indicates bias, prejudice, passion, speculation and confusion. The amount of the jury's verdict was also undoubtedly improperly influenced by Plaintiff's counsel's improper and inadmissible reference during trial to a $450,000 verdict against Cincinnati in other litigation. Accordingly, the Court should vacate the judgment and the jury verdict in this case and order a new trial.

### IV.  CONCLUSION

For the foregoing reasons, the Court should enter a judgment as a matter of law in favor of Cincinnati on all issues or alternatively, should vacate the judgment and jury verdict rendered in this case and order either a new trial or a remittitur of the damages awarded in this case.

This the ___21st___ day of November, 2005.

Respectfully submitted,
CINCINNATI INCORPORATED

BY:     S/ Roland M. Slover
ROLAND M. SLOVER, MSB # 6846
STEVEN H. RAY, *Pro Hac Vice Admission 5/23/05*

OF COUNSEL:

Roland M. Slover, Esq.

**FORMAN PERRY WATKINS KRUTZ & TARDY LLP**
200 South Lamar Street
City Centre Building, Suite 100 (39201-4099)
P.O. Box 22608
Jackson, Mississippi  39225-2608
Telephone:  (601) 960-8600

Steven H. Ray, Esq. *(pro hac vice admission 5/23/05)*
**DINSMORE & SHOHL, LLP**
255 East 5th Street, Suite 1900
Cincinnati, OH 54202
Telephone: (513) 977-8408


## CERTIFICATE OF SERVICE

I, Roland M. Slover, the undersigned attorney, do hereby certify that I have this day

electronically filed the forgoing with the Clerk of the Court using the ECF system which sent

notification of such filing to the following:

John Hunter Stevens
GRENFELL, SLEDGE & STEVENS
1855 Lakeland Drive, Suite N-10
Post Office Box 16570
Jackson, Mississippi 39236-6570
**ATTORNEY FOR PLAINTIFF**

Clifford B. Ammons, Esq.
WATKINS & EAGER
400 E. Capitol Street, Ste. 300
Jackson, MS 39205-0650
**ATTORNEY FOR LUMBERMAN'S MUTUAL**


This, the  21st  day of November, 2005.


S/ Roland M. Slover
**ROLAND M. SLOVER**